Christopher Diggs v. Burlington No & Santa Fe Mr. Wade Thank you, Your Honor. May it please the Court. Your Honor, Christopher Diggs worked for the Defendant Railroad from 1992 through January 2009 on active duty status. Hard work, heavy lifting, lots of walking, carrying heavy loads. It had adverse effect upon one of his feet. And in January 2009, he took, pursuant to the union contract, took medical leave and had surgery on his foot by his podiatrist at that time. Contrary to what's said in the defendant's brief, he did make efforts to return to work, but his doctor wouldn't release him after he'd had the first surgery. That's in the record. He also sought, while he was on leave, sedentary jobs, supervisory jobs, which he didn't get because the railroad said he didn't pass the test. In 2011, the academic test that was required, in 2011, he changed podiatrist because his podiatrist had died. And the new podiatrist, Dr. Bowles, told him that, I can fix the remaining problems with surgery, another surgery, and I can do it to where you can go back to work. He initially delayed in doing that because he contacted diabetes in the meantime, and there was a substantial risk the doctor thought, because of the diabetes, of doing this particular surgery. On page 553 of the record, Mr. Diggs explains why he finally relented to the surgery in 2014. His wife had gotten cancer, and he thought it was an economic necessity that he go back to work. By the way, he was paying, that job he had was making, I believe, $47,000, which was a lot in Mississippi, and he needed that job. He, Dr. Bowles, did the surgery in July of 2014, and almost immediately that same month, wrote a letter telling the company that he's fully able to go back to work, no restrictions, and I will release him four weeks from the date of the surgery for him to go back to work. He took that letter up to the superintendent of the primary terminal where he works, and the person in charge there at the terminal just told him that some of the management was having reservations about whether he could return to work or whether he was able to return to work. He then received from the company a detailed medical questionnaire wanting to know about all of his medical history, not limited now to what had happened with his foot, but just a detailed medical questionnaire. He responded to that questionnaire by telling the company that while he was off, he'd contacted diabetes, told them who his doctor was, and I know I'll say this wrong, so I won't try to say it, but he had a disease that affects his muscles as a result of some medication he was taking, so he had two different medical problems that had developed since he'd been off. But now no doctor has ever said at any rate that these two other problems, either the diabetes or the muscular problem that he had, would keep him from working. Well, all three doctors consistently testified in their depositions that they had told the company in 2014 at the latest, and I won't go through every detail about what doctor said what when, but at the latest, as of November 2014, all three doctors had unequivocally told the company, that is, the doctor for the diabetes, the doctor for the foot, and the doctor for the muscular problem, that all three unequivocally said there's no reason he can't go back to work. The company's response, Your Honor, and counsel has gone through excruciating detail on all the letters that their medical expert wrote saying, you know, we need more information, we need more forms, we need a more up-to-date report, we don't understand this note from the doctor. It's significant. I didn't send any of it to the doctor. I sent it to Mr. Deeds, who's a layman, and said, you gather up those answers to those questions for us from the doctors. Well, you said it's significant. Is there any case law or obligation one way or the other in one level going through the patient? The worker might seem appropriate in some way so the patient's aware. It might be easier going through directly to the doctors. Is there any sort of indication that that should be held against the company for going directly to your client? I don't see a case where this has been addressed. I notice here something that's significant to me. You know, there was a race claim here, and he kept saying, well, there's white people that's been off work. And they said, well, there's none of them that's been off work for a year. And if you've been off for a year, then we require these medical forms and all that. So I don't see any case law that's addressed. I guess the statute just makes it unlawful to discriminate against a person because you regard him as being disabled or because he has a record of a disability. The reason the company had no right to be inquiring because of these doctor's notes saying he was in good health or whatever they said, but he was eligible to go back to work without limitation. Does the company have to accept those? Let me give you a common sense answer. Just a common sense answer, you think the answer to that question is yes. The statute they cite raises a question about that. You know, it says that to do that, you've got to show that it's medically, that it's a business necessity. And there's some division. I mean, to me, that's not a ñ I can't give you a clear answer to that question. But I would say as a common sense, just as a common sense matter, I would agree that they ought to be able to ask about, you know, are you able to go back to work in view of this previous problem that you got? Now, when they start inquiring into other diseases, what have you ever had for the rest of your life? You know, what other problems have you had? I think that raises a real question about whether they're discriminating on grounds of disability. But the question was this, Your Honor, and this is really a simple question. When the doctor started sending all these letters, was she doing it because she's really trying to find out are you able to work? Or was she doing it because she intended to throw up every possible hurdle to make it sure that he wasn't able to satisfy her? And the reason ñ there are a lot of facts in the record from which the jury could draw the inference that that was the reason. One thing that stands out to me, in January of 2015, the union wrote him a letter, and it's in the record and I give a court to cite to it, and said to him, let's have a ñ under the union contract, we're entitled to have a third-party doctor. If you say he's not able, then we're entitled to have a third doctor examined, a neutral observer to decide whether he is or not. And they refused to do that. They said, well, we're not completing ñ we haven't studied the records completely, and this is in early 2015, so they wouldn't allow a neutral doctor to look at it. And the next thing, Your Honor, that seems significant to me is why ñ I mean, a jury could infer ñ I'm not saying that this is the only inference you could draw, but a jury could reasonably infer if they want to find out about what his medical condition is, why don't they just talk to the doctor? All three doctors said they never talked to me. And one of them, Dr. Housley, was adamant. I put in my letter when I wrote him in 2014, if you have a question, call me. I'll talk to you about it. Why don't they talk to the doctor and ask them what do they mean by it? And why do they insist ñ here's another question, Your Honor. One thing lawyers do, you know, we have to respond to discovery. We have to take these questions. The other side gets them. If we don't give an answer, we can know when it comes up at trial we're not going to get the evidence in. So we kind of ñ well, my wife is. I'm not. But my wife, Rachel, is quite good at it. And we got involved, or she got involved, in sending them to them. And she would ñ she started out by sending them every medical record in March of 2016. And she had then, I think, four different letters that she responded. But each time they wouldn't ever call her back or write her back. They would send something to Mr. Diggs and say, well, this latest information is not sufficient. So a jury ñ here's another thing. We talked about lawyers. Here's what we all ñ or what juries may know about doctors. Doctors are out there doing a couple things. They're trying to make a living like everybody else, and they're treating their patients. A doctor's attitude is, I don't have time to be answering all these detailed forms that you got me filling out here. So it's inherently making it difficult when they send it to him and say, you go get your doctor to do it. Well, he's not being paid to do it. They're just doing it because they like Mr. Diggs is about the reason they did it. But if you're alleging disability discrimination, and once ñ and it might have been nitpicky. It might have been excessive. But once your client does provide all these records, once they finally satisfy this doctor who works for the railroad, they bring him back to work. So doesn't that make it hard to show it was pretext and just a way to avoid him coming back to work when actual compliance resulted in him getting back on the job? I need to answer that in a couple ways, John. In the first place, we filed an EEOC charge, and we had the trial coming up within about three or four months. In the second place, the record ñ all is in the record. I'm going to have to tell you the answer to your question is not in the record. In the record, the doctor says I notified them that he met the requirements. But there's nothing in the record about whether he went back to work, so I believe I'm not allowed to comment on that. But the record ended with the doctor saying I now approve him to come back to work. Yes, that's true. I thought at least the company was finally satisfied. Well, Your Honor, it's not in the record, so I can't answer that. I wish I could, but the answer to that is unless Your Honor wants me to go outside the record, I can't answer that. Look, can you point to ñ in terms of showing pretext, can you point to any examples where your client satisfied the record request and then they just added on an additional request that wasn't follow-up? I mean, it's logical if they get something and they have a concern they're going to follow-up. It's something completely unrelated. Well, I'd refer you to Dr. Housley's testimony where he testified that in August, let's see, it's on 669 and 670 of the record where Dr. Housley testifies that he had ñ they had claimed that they were not satisfied with a letter that he wrote in November, and they wanted him to summarize all of his notes that had been before. And he wrote them back and said that it's not ñ I'll do it. I'll give you a little summary, but it's not contemporaneous. It's not accurate. It's not contemporaneous. The best record is what was there. He talks about this on 669 and 670. And it's also repetitive of what I've already told you. I told you in August about all this. And he gave his opinion that this lady is just trying to make it ñ she's either doing it to be difficult or she doesn't know what she's doing. And we asked him at the deposition, this is where Dr. Housley is testifying, well, could it be that they were just trying to keep him from going back to work? And he said, yeah, that could be it too. But the drawing of inferences, and I'm referring you now to pages 668 through 670 of Dr. Housley's testimony, Your Honor. And, of course, Dr. Bowles testified in his deposition that he hadn't seen him since November of 2014. And so these things about we want up-to-date records from Dr. Bowles when he released him in 2014, you could also find that that was just a hoax. So I think what I'm saying, Your Honor, the statute, the ADA, specifically provides, and I meant to give the Court this cite, 4212112B3, that it's a violation of the Act to utilize methods of administration that have the effect of discriminating on the grounds of disability. That's a violation. They use methods of administration. Well, the method they used was not to just get the doctor's notes. They didn't start asking about getting specific notes until 2016. The method they used was designed, or a jury could find, it was designed to delay the whole process and to hope at some point he'd just give up and go home. Because, for example, when we sent the records, when we sent four or five letters with records, they don't respond to us and say there's anything wrong with what you do. They send Mr. Diggs a letter. I mean, going through, it's always an unnecessary chain that they're doing. So to me, Your Honor, a jury does not have to accept and it's not proper to tell a jury that you've got to accept what their doctor says, that I was doing this for legitimate reasons and I was sending these forms. And as far as, Your Honor, on the thing about proven pretext, that's an interesting question because in the Atkins case, cited in the brief, the United States Supreme Court, Justice Rehnquist said, well, once a case has got all the evidence in, it's not really an issue about prima facie case and pretext and all that. The question then is whether there's substantial evidence from which a jury could find discrimination. And in this case, this is especially in an ADA case because it's not like a race case or a sex case where a man replaced with a woman is different. There was evidence from which a jury could infer that the doctor's intent was not to find out whether he could go to work or not. If that was intent, they just asked the foot doctor. And they asked the foot doctor, well, what do you mean about, in one of his letters in July, he said, at this time. What do you mean he's able at this time? And the doctor said, well, what I meant was, anytime anybody's been off a long time, you need a trial basis to make sure that he can do it. He's going to be out of shape. But the fact that they would ignore talking to the doctors and just go around the world, I just believe there's evidence it was all a hoax and they never did intend to put him back to work ever. All right, counsel. We'll hear you again on rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Brian Neal for BNSF Railway. I'm going to try to cover three problems with the argument that the appellate is making in this case. I want to start with something that's both a problem with the argument that's being made but also some context for what was going on here. It's undisputed that everything that was done here in terms of what Dr. Gillis was requesting, Dr. Gillis being the railroad doctor, was the normal process that BNSF followed for someone coming back from an extended leave. And the rule she talked about was someone out for more than a year. Mr. Diggs was out for five years. The key here is that Dr. Gillis was not asking for Mr. Diggs' doctors to make the fitness-for-duty determination. Dr. Gillis makes the fitness-for-duty determination on behalf of the railroad. She was asking for data from those doctors. And I'll tell you, that's the normal way that railroads do it, but it is different than other employers and other cases that you may have seen, and it may have been different from what Mr. Diggs' doctors had seen where they were used to just releasing someone to come back to work and the employer has delegated that responsibility for the fitness-for-duty determination to the employee's doctor or some employers would delegate it to some other doctor. But in the railroad context and here, Dr. Gillis is the one making that determination. So when the argument is made that Dr. Gillis should have just accepted the releases from the three doctors for this employee and moreover that not doing so was so bad that it was evidence of discriminatory motive, it's really an argument that BNSF ought to change its way of doing things. It's saying, you know, you can't do your own fitness-for-duty evaluation because when that employee brings that release in, you can't do your own. You've got to defer to that doctor. And so that's both a problem with the context or it's a problem with the arguments being made, but it also gives you some context for why Dr. Gillis was asking for this information and not just saying, oh, well, I see that you've released him to come back to work. I don't need to see anything else. It seems to me the principal evidentiary question in this case, whether it is a question that's a legal issue, is whether the way in which this additional information was being questioned, the question of the frequency, the actual requests, are those evidence of pretext of some sort. What's your ‑‑ that may have been one of your three points. I'm not sure, but what do you make of this record in which certainly from the plaintiff's viewpoint there were unnecessarily repetitive and duplicative requests, whatever other adjective ought to be thrown in there? That's not one of my three points, but I was going to come to that at the end of it, so let's talk about that. There really are not as many requests as it may seem when we go through the detail in our brief because a great number of those were repeats. Dr. Gillis would send out something and wouldn't hear anything. So she would take the initiative and go back to Mr. Diggs and say I haven't heard anything from you or still haven't received anything. Here's a reminder of the things that I need. So when you go through that chronology that we have in our brief, for the entire time of August 2014 when she started until February of 2016, every one of those requests is trying to get what she originally asked for in August of 2014, so about a year and a half there. It's all about the original set. And then February of 2016 is the first time she asked for something new. And so from February of 2016 to September, there are exchanges, and some of those exchanges are still her going back saying, well, in February I asked you for this. I still don't have this. And then there were sort of two categories of additional requests. Some of those were she would get records, but there would be a gap. She would get records in June, but she would see that the records she got ended August of the prior year, for example. So she'd go back and say, well, I don't understand because you appear to still be seeing him, but there's a gap here, so I need to fill in that gap. And then the second category of additional information in that last seven-month period, six-and-a-half-month period, were medically-related follow-up questions. You know, I've read this. I have a question about this. I've read this. I don't understand this issue about this medical condition or this medical condition. And I understand that a layperson may feel like that is nitpicking, but there's been no testimony here, despite the doctors on Mr. Diggs's personal doctor, saying that they did release him and they didn't understand why they were getting these questions. No one has come in and said, look, I understand what role Dr. Gillis had, and I'm telling you there's no reasonable medical basis for her to be asking these questions. There was no testimony like that. There was no testimony that what she's asking for has nothing to do with the medical conditions. You know, she wasn't asking for something off the wall. She wasn't saying, I need to see your last ten golf scores before you can come back. I mean, there's nothing out of line here. I mean, they're clearly medically-related to the information that she's seeing. What would be, I think, necessary for Judge Aycock is to say there's nothing there that would create a fact question for a jury on what was really going on. And just the length of time, the frequency of requests, the number of requests does at least start you down that road of figuring out, wondering if there's a fact question to support something other than just good-faith efforts to get the medical information. So you got any response to why this is clearly summary judgment material? I'm sorry, any response? Why is this clearly summary judgment sort of evidence? Because the only evidence here is that you had a railroad doctor and the only evidence is that this was the normal process who was doing what she normally does, trying to get the information to make a fitness for duty determination. And as Judge Costa pointed out, when she finally got it, she released him to come back to work. And the questions here were not out of line. You can have an expert come in and say that there's no reasonable basis from a medical perspective to be asking this. And as I said, the time period, standing back, you may say, well, why did it take so long? But when you realize that there's this extended period of time where she's trying to get the information, and then another fact I'll throw in there is that Mr. Diggs just dropped off the calendar for really about a year and a half. From late 2014 until you go to April 2016, Dr. Gillis sends a letter and says, look, we haven't heard from you in a long time, and now you've been out for another year. And that was when she went back and said, now you've been out so long, we need you to fill out another medical questionnaire. Are you saying that expert testimony would have been necessary to explain that this was not all legitimate inquiries? No, I'm saying that's one thing that could have done it. Another thing would be if she was asking for something that was clearly out of line, that clearly wasn't a medically related follow-up, or if her doctors, even if his doctors, potentially could have said something even though each was dealing with their own area of specialty. But I don't know on what basis a jury would look at this and say, I'm going to decide that Dr. Gillis was not acting in a medically appropriate way. And so much so, not just that we disagree with her, but that her statements that she was doing what she thought was medically appropriate are unworthy of credence or evidence of discriminatory motive. Let me ask you a procedural point. You had conceded for purposes of summary judgment only. The first three steps of a prima facie case. But then Judge Aycock said, in fact, that the plaintiff had not shown the decision was because of a disability. Didn't she go beyond what she could do on summary judgment? Isn't that a procedural error on her part? I'm not sure I understand the question. Well, what is the basis of her ruling? Is it not on summary judgment that it was not shown by the plaintiff that, in fact, causation that his disability was the cause of his complaint? And that is something that for purposes of summary judgment, first three steps, he was qualified. He suffered an adverse appointment action. The decision was the basis of his disability. Adverse appointment decision was on the basis of his disability. It's that last one that you had conceded for purposes of summary judgment. But isn't that what she ruled had not been shown? No, no. Mr. Diggs argued that we conceded it, but we did not concede that. That is the basis. Let's work backwards then. Is that the basis on which Judge Aycock ruled? She ruled on two. That was one. One, she ruled that Mr. Diggs had not shown a prima facie case. And then she went on to say that there had been no ultimate evidence of a showing of discriminatory motive or pretext. And on appeal, we have repeated the argument on no showing a prima facie case. I wasn't planning on getting into that today unless you had questions, but … Well, I am worried about the legitimacy of her ruling in light of Mr. Wade's argument that all three of those first three steps of prima facie case had been conceded on your part for summary judgment. And you're saying it wasn't. Tell me … It was not conceded. Well, we'll just have to look at, I guess, how it was … on what basis that argument is being made. What is the basis that he's arguing that it was conceded and respond to it? There was an argument because there were some older … there was a split in the Fifth Circuit's opinions about what was required for an ADA prima facie case. And we … our side was citing some of the opinions that required that the plaintiff point to a replacement. And the judge resolved that issue against us and said, no, you don't have to do that, and … but went on to say, you know, but I'm going to get to what the actual element of the prima facie case is and resolve that against Mr. Diggs. But wholly aside from the prima facie case issue, the judge went on and took up the NSF stated reason for the action and found that Mr. Diggs had not presented sufficient evidence to overcome that. What about Dr. Housley's testimony, the rheumatologist, who said that he complained of, you know, they've got all they need. I mean, look, I've already given them this information.  I don't know exactly what that means, but your expert testimony, it's saying that he's given them adequate medical records. Yeah. What he was talking about was … when it's phrased that way, it sounds like, you know, he's already provided a bunch of information and doesn't understand why they're asking for more. That isn't what happened. He was talking about the very first request. The very first request asked for a written evaluation from him, and he didn't like that for whatever reason. He said, well, I don't need to do that. I can just send you my clinic notes, and if you want more than that, you know, you're reading right. That's basically what he said in his deposition. Well, Council Officer points out that that's going to be a very typical response from a practicing physician who really can't spend a few hours a day answering notes with no compensation. And some doctors will do that, and some will not if an employee goes in there. But Dr. Gillis, she didn't go back and say, no, I don't want your records. I want an evaluation. She took the records and looked at those. And then later, I think she went back and said, Claire, I need one short note about this topic. But she never went back and said, no, I'm insisting that you give me an evaluation, even though you think it's sufficient to give me your records. She didn't argue with him about that. Is the evidence that this level of detail was consistent with company policy? I think if the person was out more than a year, I think Gillis makes some reference to it. Is that the evidence? Is there anything else? That's really what the evidence is. She said, this is the normal thing that I would do. I would do it the same way as for anyone else. Now, of course, everybody's medical situation is different, so we didn't go find someone who had these same three conditions, who'd been out for five years. But one year, that's where the line is drawn? If you're past one year absence, you get all this paperwork to do? That's when you do the fitness review. They don't ask for as wide-ranging information if you're out for a shorter period. And that's just because of what we talked about in the brief. It's a very safety-sensitive job. They're out there, and they're presenting potential dangers to themselves, to their workers, and to the public as these trains go through various cities and towns. Now, the second point that I wanted to make is really related to the first point about employers doing their own fitness for duty reviews. And it's simply that the Americans with Disabilities Act permits that. And just to contrast it with, for example, the Family Medical Leave Act, where if an employer has to accept medical certification from his or her doctor, putting aside situations where there are questions and you have a second and third opinion issue, the employer has to accept that certification from the employee's doctor under the FMLA. And that's the difference between the ADA and the FMLA. When an employer is doing an examination that's under the ADA, now, there's been some talk about the job-related and consistent with business necessity standard under the ADA. And there was a letter filed late yesterday that I haven't responded to yet, but it invokes that. And I just want to be clear here. There was never any claim raised here under the ADA medical examination provision, and there was never any argument made, even separate from whether a claim was made, that these provisions. Now, if that argument had been made, or if for whatever reason the Court were to reach that, I would say, of course it's job-related and consistent with business necessity. The man was out for five years, and, in fact, he, it turned out, he had developed other conditions, so that's a good example of why, after that one-year period, the railroad looks a little deeper than somebody who's out for a few weeks. And I'd point you to the Porter case in our brief. It's in footnote 8 of our brief, the red brief, on page 25, and the Henderson case. And those cite EEOC authority that says that somebody coming back from a medical leave is a, you know, it's a pretty established situation when an employer is permitted to do that, that, that fixed-duty review. And the third and final point that I wanted to make about the arguments on the other side is, is one that we made in our brief, it's, it's that the, the entire argument is just another way of saying, I'm, I'm, I'm arguing that there's evidence of, of either pretext or discriminatory motive because I'm challenging your judgment on how you ought to go about doing things. And the court's seen that in various contexts. You know, this, this misconduct wasn't enough for a discharge. You shouldn't have had a reduction in force. My performance was good. You say it was bad. In all those contexts, the court has said that, that that's not sufficient. And, and I would say that in the context of, of medical judgments, and if you have conflicting medical opinions, you know, that's a situation where the court ought to be even more vigilant in, in not finding that to be sufficient evidence of discriminatory motive because it's well known that doctors can disagree. And so unless you've got a situation where, you know, it's clear that someone is going so far beyond the bounds of medical reasonableness, that ought not be evidence that, that the doctor says he can come back, that the first doctor says, or that the first doctor is, you know, not just having a difference of opinion, but is acting out of a discriminatory motive and having that difference of opinion. And we've cited some cases where even in, in the context where the ADA doesn't require a showing of motive, the court has said that that conflict between reasonable medical opinions isn't sufficient to create a fact issue. And then, and then finally, just taking it back to the beginning, we really don't even have a conflict in medical opinions here because Dr. Gillis, it's not that she said, I'm, I'm not approving you to come back to work and his doctor said, yes, you can come back to work. She just said, I want the data so I can do my own fitness duty with you. How do you respond to the question Mr. Costa, Judge Costa asked Mr. Wade about, was there something, at least on timing, about his being authorized to return to work coincident with an EEOC charge or otherwise? By the, I mean, he, he filed the lawsuit while he was out, so it was ongoing, and so yes, the, the litigation was proceeding at the time that, that he ended up being approved to come back to work. Well, it was ongoing, but was there anything happening right at the time of his being approved to come back to work? Had he just filed something? I don't think so. What I think I heard Mr. Wade say was that the trial was set a few months later and I, I can't say I've actually gone back and looked at the scheduling order, but what I would say is that if that's all that happened, I would, I would take that point. If, if suddenly Dr. Gillis said, okay, I'm going to put you back to work, I would take that point. But that's not all that happened. She was getting more information, and frankly, it's, it's his lawyers who were finally able to look at the letters and get the information, although when you look at the record, 389, 366, and 370, you can see even his lawyers were having difficulty getting the information out of his doctors. And so, you know, maybe, maybe that's, maybe that's a complaint about the process, but it's not evidence of discriminatory motive. All right, counsel. Thank you. First, let me talk about this thing about the doctor releasing him to go back to work, and Your Honor asked a question that I said I couldn't answer because it's outside the record. If Your Honor's regard to that is important to the appeal, I'd ask, I'd like to ask the court to remand it to develop the record on what happened when he tried to go back to work. You know, I can't, if I can comment on that, it's not in the record. But you're disputing even that he was cleared to go back to work? No, sir. The doctor said, I'm going to clear you to go back to work. We're not disputing that. That's in the record that Gillis said, you're okay now to go back. You're just saying what happened next you don't think is in the record. Yeah, whether they actually allowed him to go back to work is not in the record, whether he actually went back to work. Your Honor, let me talk about this policy, what they said, because it really cut across him on the race claim. There's no point going into the race claim, except that we were trying to find out, do you have other people in this same situation that you allow to come back to work for race purposes? And what they said was, everybody else that we've allowed to come back, and we've got four or five examples, they weren't out as long as you were. And our policy is, if you've been out a year, then you've got to do all these forms. My question is, I wonder, they never said we have ever let anybody return to work after he's been out for more than a year. Nobody ever said that's ever happened. There's nothing in the record that's ever happened. So what I'm suggesting is, it might be that this entire policy is designed to keep him from coming back to work. Your Honor says, well, is this the same way they do everybody? It very well may be. And it very well may be that they do it so that they won't have to take workers that they regard as disabled or have had a history of a disability. That may be the very reason for that policy of sending out these forms. And as far as him saying, well, their doctor looks into whether he can do the job or not, the record is full of these work status forms, they call them, about, do you understand Dr. D has to do all of these functions? And they sent all three of them. So they got those answers from the doctors. Your Honor. There's two things. I've looked through most of these letters Dr. Gill has sent, and there's a couple things that I think are inconsistent with the finding of disability discrimination that I want you to respond to. One is, towards the end, she gives, I think it's your law firm, she gives an extension and says the deadline is here, but you say you need more time. Okay, I'll give you an extension before I close this file and let you try to complete it. And then she also, as I think opposite counsel mentioned, early on she reached out to your client when he just hadn't done anything. And it seems to me if she really was set on him not returning to work, she just would have let the thing lie. But she took the initiative to say, oh, I haven't heard from you. Remember, I need this. So how are those two facts consistent with discrimination? Well, in the first place, Your Honor, I'm not saying they don't have any evidence on their side in the first place. I'm saying there's a conflict in evidence. But in the second place, she wrote that, that she'd been uncooperative. There's nothing in there except she says that. The very first thing, he started immediately when he got the thing in July, taking his records up to the superintendent. And then there's a December letter in there that he wrote and said, here are all my records. So the question as to whether he avoided her or failed to send any records, that just depends on her credibility. She says that in the letter. I'm sorry. The extension. Yeah, the extension. Well, they had a union contract, Your Honor. They had to let him out on leave. And they had a, I mean, we don't go into any details about what it was. But they were apparently allowed after he didn't respond a certain time to fire him. So I'm certain she wasn't going to do anything to get her in trouble with the union or whatever, indicate she hadn't done it. Your Honor, to me, the statute is very clear on what it means to be regarded as having a disability. I might refer to this case that we cited, and it is a late case, Taylor v. Sherman, 798F3rd at 286. It said in that case that this court said the very use of the word chronic, when you're wanting information about chronic medical problems, indicates that is another way of saying you want information about whether he has an impairment that substantially affects his everyday life activities. Every one of these letters just about has the word chronic, just like in Taylor. So the fact that they would use the word chronic and we want information about your chronic condition is a, it doesn't prove as a fact that they're regarding him as disabled, but it's a fact the jury should consider. They regard him as chronically ill. And she's either telling the truth or she's not telling the truth. She's either doing this because she really wants to find out whether he can go back to work or she's doing it because she wants to delay it as much as possible and maybe discourage him from ever coming back to work. And to me, that's just a question for the jury. It's a state of mind that the jury ought to be allowed to decide. Thank you, Your Honor. We thank you both for your help in us understanding this case. We'll call the last case.